BENJAMIN B. WAGNER
United States Attorney
MATTHEW M. YELOVICH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

FILED

JAN -5 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
            DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. |
|---|---|
| Plaintiff, | 2:16-CR-1 TLN |
| v. | |
| ZALATHIEL AGUILA, and OMAR ANABO, | |
| Defendants. | |

## INFORMATION

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Make False Statements on Loan Applications]

The United States Attorney charges: T H A T

ZALATHIEL AGUILA, and
OMAR ANABO,

defendants herein, from in or about October 2004, through in or about July 2007 (the "relevant period"), in the County of Solano, State and Eastern District of California, and elsewhere, knowingly conspired and agreed with others to commit an offense against the United States, specifically: making false statements in loan applications, in violation of Title 18, United States Code, Section 1014.

### I. BACKGROUND

1.  During the relevant period, defendant ZALATHIEL AGUILA was a resident of Vallejo,

in the State and Eastern District of California.

2. During the relevant period, OMAR ANABO was a resident of Hercules, in the State and Northern District of California.

3. During the relevant period, COCONSPIRATOR A was a resident of Poway, California, in the State and Southern District of California.

4. During the relevant period, Downey Savings & Loan Association, F.A., was a financial institution, as that term is defined in Title 18, United States Code, Section 20, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and which engaged in and the activities of which affected interstate commerce.

5. During the relevant period, CAPITAL ACCESS, LLC, was a company based at 1301 Tennessee Street in Vallejo, in the State and Eastern District of California, and was operated by ZALATHIEL AGUILA, OMAR ANABO, and COCONSPIRATOR A.

## II. THE CONSPIRACY

6. From at least in or about October 2004, up to and including at least in or about July 2007, in the State and Eastern District of California and elsewhere, ZALATHIEL AGUILA, OMAR ANABO, and COCONSPIRATOR A, and others known and unknown, conspired to and conducted a mortgage fraud scheme targeting financially distressed homeowners by convincing them to sign over title in their homes to straw buyers, and targeting federally insured financial institutions by making false statements to them, knowing those statements were false, in order to influence the actions of those financial institutions.

## III. MANNER AND MEANS

In furtherance of the conspiracy, AGUILA, ANABO, and COCONSPIRATOR A employed the following ways and means, among others:

7. AGUILA, ANABO, and COCONSPIRATOR A targeted homeowners who had received a notice of default, or were on a list to receive such a notice, to lure them into signing away title in their homes. AGUILA, ANABO, and COCONSPIRATOR A hosted seminars and presentations, and mailed brochures and solicitations, to attempt to persuade these distressed homeowners to engage CAPITAL ACCESS to "keep" their home(s). The program was described to the homeowners as bringing in an

outside "qualified investor," who was in fact a straw buyer, purportedly to help the homeowners avoid foreclosure, keep their homes, and repair their damaged credit. AGUILA, ANABO, and COCONSPIRATOR A made or caused to be made a variety of material false statements and omissions during this recruitment process. In some cases, homeowners were told that at the conclusion of a two-year period, the homeowners would have the opportunity to refinance their home mortgage and the program with Capital Access would cease. In other cases, homeowners were told that their home would be kept in a trust for one to two years until their credit and financial situation improved enough to cease Capital Access's involvement. For most of the known homeowners who enrolled in the program, neither of these circumstances occurred.

8. Instead, during the process of acquiring the homes, AGUILA, ANABO, and COCONSPIRATOR A made material omissions and false statements regarding and otherwise failed to disclose, inter alia, the following information: that the CAPITAL ACCESS program actually involved the homeowners' signing over title in their homes in full to the straw buyer, who had been recruited by AGUILA, ANABO, and COCONSPIRATOR A for having an optimal credit score, and who would receive a cash payment at the close of the transaction and was often a friend or relative of AGUILA, ANABO, and/or COCONSPIRATOR A; that the homeowners' existing equity would be used for mortgage payments, operating expenses of CAPITAL ACCESS, and the personal expenses of AGUILA, ANABO, and COCONSPIRATOR A; and that very few, if any, distressed homeowners would eventually emerge from the scheme with their credit improved and home ownership and equity intact.

9. At the same time, to qualify for mortgages and refinancing loans, AGUILA, ANABO, and COCONSPIRATOR A made and caused to be made materially false statements on loan applications to federally insured financial institutions including (1) that the straw buyers intended to occupy the property as a primary residence, and (2) that the straw buyers' own money was the source of the down payment funds. AGUILA, ANABO, and COCONSPIRATOR A knew that the straw buyers would not occupy the homes as primary residences—the scheme depended on them not doing so, so that the homeowners could remain in the homes—and knew that the source of the down payments was in fact CAPITAL ACCESS bank accounts over which AGUILA, ANABO, and COCONSPIRATOR A were signatories. AGUILA, ANABO, and COCONSPIRATOR A knew that these materially false statements

were being made on loan applications, knew that the statements were false and material, and intended to defraud the financial institutions into offering loans and/or providing better rates on those loans.

10. At times and in order to (1) conceal the loss of title and equity, (2) perpetuate the scheme, and (3) placate the homeowners, AGUILA, ANABO, and COCONSPIRATOR A made and caused to be made additional material false representations and material omissions.

11. In all, AGUILA, ANABO, and COCONSPIRATOR A caused the fraudulent sale of at least approximately $27,025,635 in home properties, involving at least sixty-nine unique properties; caused federally-insured financial institutions to issue at least approximately $23,993,106 in fraudulently-obtained property loans; and caused an estimated actual loss to the lenders of at least approximately $10,473,606.

## IV. OVERT ACTS

In furtherance of the conspiracy, and to achieve the objects thereof, AGUILA, ANABO, and COCONSPIRATOR A, and others known and unknown, performed, among others, the following overt acts in the State and Eastern District of California and elsewhere:

12. On or about December 25, 2005, Straw Buyer 1, who had previously met in her home with AGUILA and COCONSPIRATOR A, stated on her loan application to Downey Savings and Loan Association, F.A., that she intended to occupy 210 Hampshire Street in Vallejo, California, as her primary residence, and ANABO signed the same loan application as the interviewer.

13. On or about December 27, 2005, Straw Buyer 2, who had previously attended a presentation given by AGUILA and COCONSPIRATOR A, stated on his loan application to Downey Savings and Loan Association, F.A., that he intended to occupy 145 Pavon in Hercules, California, as his primary residence, and ANABO signed the same loan application as the interviewer.

14. On or about April 15, 2006, Straw Buyers 3A and 3B, who were previously recruited to the scheme by AGUILA, stated on their loan application to Downey Savings and Loan Association, F.A., that they intended to occupy 727 Highland Place in San Dimas, California, as their primary residence, and ANABO signed the same loan application as the interviewer.

///
///

Dated: January 5, 2016

BENJAMIN B. WAGNER
United States Attorney

By: /s/ Matthew M. Yelovich
MATTHEW M. YELOVICH
Assistant United States Attorney

INFORMATION                                5

## United States v. ZALATHIEL AGUILA and OMAR ANABO
## Penalties for Information

**COUNT 1:** ALL DEFENDANTS (AGUILA and ANABO)

VIOLATION: 18 U.S.C. § 371 – Conspiracy to Make False Statements on Loan Applications

PENALTIES: A maximum of up to 5 years in prison; or
Fine of up to $250,000; or both fine and imprisonment
Maximum of up to 3 years of supervised release

SPECIAL ASSESSMENT: $100 (mandatory on each count)