BENJAMIN B. WAGNER
United States Attorney
MATTHEW M. YELOVICH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

FILED
JAN 15 2016
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. OMAR ANABO, Defendant. | CASE NO. 2:16-CR-00001 GEB<br>PLEA AGREEMENT<br>DATE: JANUARY 15, 2016<br>TIME: 9:00 a.m.<br>COURT: Hon. Garland E. Burrell, Jr. |

## I. INTRODUCTION

### A. Scope of Agreement.

The information in this case charges the defendant with violation(s) of 18 U.S.C. § 371 – Conspiracy to Make False Statements on Loan Applications in Violation of 18 U.S.C. § 1014. This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B. Court Not a Party.

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in

the information. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II. DEFENDANT'S OBLIGATIONS

### A. Guilty Plea.

The defendant will plead guilty to one count of violating 18 U.S.C. § 371. The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea(s) should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1. Waiver of Indictment:

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges set forth in the information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by

Indictment.

**B. Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses.

Defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the periods of October 2004 through July 2007. The amount of restitution will be at least approximately $10.47 million dollars. The defendant will be jointly and severally liable for this amount with ZALATHIEL AGUILA and Coconspirator A.

Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C. Fine**

The defendant reserves the right to argue at sentencing that he is unable to pay a fine and that no fine should be imposed. He agrees, however, to pay whatever fine is ordered by the Court up to the statutory maximum of his offense.

**D. Special Assessment.**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing.

**E. Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a cooperating defendant violates the

plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement. The determination whether the defendant has violated the plea agreement will be under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

**F. Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that this plea agreement is voidable at the option of the government if the defendant fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time.

**G. Agreement to Cooperate.**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

## III. THE GOVERNMENT'S OBLIGATIONS

**A. Dismissals.**

The government agrees not to pursue other charges against the defendant related to the conduct described in the Factual Basis for Plea attached hereto as Exhibit A except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.B.3 (Reduction of Sentence for Cooperation) , VI.B (Guidelines Calculations), and VII.B (Waiver of Appeal and Collateral Attack) herein.

**B. Recommendations.**

1. Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

2. Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

3. Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence, after operation of the statutory maximum, if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that he must comply with paragraphs II.G and not violate this plea agreement as set forth in paragraph II.E herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea(s) based on the fact

that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**C. Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

Further, other than as set forth above, the government agrees that any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable guideline range, pursuant to U.S.S.G. § 1B1.8, unless the information is used to respond to representations made to the Court by the defendant, or on his behalf, that contradict information provided by the defendant during his cooperation.

## IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense(s) to which the defendant is pleading guilty, Conspiracy to Make False Statements in Loan Applications:

First, beginning in or about October 2004, and ending in or about July 2007, there was an agreement between two or more persons to commit at least one crime as charged in the information;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after December 25, 2005 for the purpose of carrying out the conspiracy.

In addition, the elements for the underlying offense, Making False Statements in Loan

Applications, are as follows:

First, the defendant made a false statement to a federally insured financial institution;

Second, the defendant made the false statement to the financial institution knowing it was false; and

Third, the defendant did so for the purpose of influencing in any way the action of the financial institution.

The defendant fully understands the nature and elements of the crimes charged in the information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V. MAXIMUM SENTENCE

### A. Maximum Penalty.

The maximum sentence that the Court can impose is 5 years of incarceration, a fine of $250,000, a 3 year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count(s) to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B. Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to 2 additional years of imprisonment.

## VI. SENTENCING DETERMINATION

### A. Statutory Authority.

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The

defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B. Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1. Base Offense Level: 6 (U.S.S.G. § 2X1.1(a), 2B1.1(a)(2))

2. Loss Amount: +20 (§ 2B1.1(b)(1)(F): Based on the information available to the parties as of the date of this agreement, the loss is believed to be at least $10.47 million.)

3. Victim-related Adjustments: +4 (§ 2B1.1(b)(2)(B): Based on the information available to the parties as of the date of this agreement, at least five victims have suffered substantial financial hardship as defined in the U.S.S.G.).

4. Specific Offense Characteristics: +2 (sophisticated means, § 2B1.1(b)(10)(C) – ESTIMATED AND LEFT OPEN TO ARGUMENT)

5. Role in the Offense Adjustment: None

6. Obstruction Adjustment: None

7. Adjusted Offense Level: 32

8. Acceptance of Responsibility: -3 (see paragraph III.B.2 above)

9. Criminal History: I (ESTIMATED)

10. Departures: None

11. Sentencing Range: 87–108 months (ESTIMATED)

12. Departures or Other Enhancements or Reductions:

The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a). The government is not obligated to recommend any specific sentence.

## VII. WAIVERS

**A. Waiver of Constitutional Rights.**

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

**B. Waiver of Appeal and Collateral Attack.**

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the agreement in paragraph III.A above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

**C. Waiver of Attorneys' Fees and Costs.**

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

**D. Impact of Plea on Defendant's Immigration Status.**

Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including offense(s) to which the defendant is pleading guilty. Indeed, because defendant is pleading guilty to Conspiracy to Make False Statements in Loan Applications, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

## VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

**A. Defense Counsel.**

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated:

DWIGHT M. SAMUEL
Attorney for Defendant

**B. Defendant:**

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated:

OMAR ANABO
Defendant

**C. Court Certified Interpreter/Translator:**

I declare that I am a court ***certified ***Tagalog-English interpreter/translator. On ________________, I read the entire contents of the foregoing plea agreement to ****, translating the document from English to ***Tagalog.

Dated:

N/A

Interpreter/Translator

**D. Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: 1/15/16

BENJAMIN B. WAGNER
United States Attorney

MATTHEW M. YELOVICH
Assistant United States Attorney

EXHIBIT "A"

Factual Basis for Plea(s)

From at least on or about October 2004 through at least on or about May 2007 (the "relevant period"), ZALATHIEL AGUILA, OMAR ANABO, and Coconspirator A conducted a large-scale mortgage fraud scheme involving preying on financially distressed homeowners of at least approximately sixty-nine properties and receiving millions of dollars in fraudulently-obtained loans from federally-insured financial institutions. During the relevant period, AGUILA, ANABO, and Coconspirator A operated Capital Access, LLC ("Capital Access") in Vallejo, California, and ANABO operated Quest Financial Services, Inc., also in Vallejo. Using these companies and Capital Access's bank accounts to which they were signatories, AGUILA, ANABO, and Coconspirator A targeted distressed homeowners and convinced them to sign over title in their homes, often unknowingly, to Capital Access by promising to help them remain in their homes using outside "qualified investors." AGUILA, ANABO, and Coconspirator A assured these distressed homeowners that these "qualified investors" had good credit and would allow the homeowners to remain in their homes for two years while paying rent to Capital Access, after which time, assuming the homeowners' creditworthiness had improved to a certain threshold, the homeowners would be able to remain in their home and the involvement of Capital Access and the qualified investors would cease. Many of these distressed homeowners were never told that in agreeing to the temporary rescue plan, the homeowners were permanently signing over title to their homes to Capital Access; that equity was being stripped from their homes in order to fund Capital Access, the personal expenses of AGUILA, ANABO, and Coconspirator A, and further down payments and mortgage payments to continue the fraud; or that the "qualified investor" being brought in was in fact a straw buyer being recruited to purchase the distressed homeowners' home(s). In fact, AGUILA, ANABO, and Coconspirator A mailed, were aware of, or reasonably should have known or foreseen the mailing of a Capital Access brochure to unknowing victims touting the "Keep Your Home" program, through which homeowners would "regain[ ] control of their finances and remain happily in their homes" while "avoid[ing] a foreclosure" and "rebuild[ing] . . . credit." No mention is made in the brochure of the homeowners signing over title in their homes to Capital Access, and it was often unclear to homeowners what exactly was happening to their homes: on

certain occasions, homeowners were not told that the program involved losing title, while on other occasions, homeowners believed that they were going to be co-owners of the home with outside investors. Moreover, at some point during the conspiracy and in order to further conceal the true nature of the transaction from victim homeowners, AGUILA, ANABO, and Coconspirator A changed the term they were using to describe straw buyers from "qualified buyer" to "qualified investor." AGUILA, ANABO, and Coconspirator A did all of this knowingly and with the intent to defraud the homeowners.

Simultaneous to the defrauding of distressed homeowners, AGUILA, ANABO, and Coconspirator A were defrauding federally-insured financial institutions by knowingly using materially false statements to obtain property loans. AGUILA, ANABO, and Coconspirator A arranged for "qualified investors," who were in reality straw buyers, to buy the homes of the distressed homeowners. In so doing, AGUILA, ANABO, and Coconspirator A knowingly arranged for these straw buyers to apply for loans while making material false statements to the banks, such as: (1) that the source of the down payment funds was the straw buyer, when in fact AGUILA, ANABO, and Coconspirator A, using Capital Access bank accounts, knowingly provided the down payment funds or were aware that the funds were coming from Capital Access and not the straw buyer, and (2) that the straw buyers would occupy the homes as primary residences, when in fact AGUILA, ANABO, and Coconspirator A knew that the sellers would remain in the homes after the sale. AGUILA, ANABO, and Coconspirator A knew that these false statements were being submitted to the banks, which were federally-insured at the time of issuing the loans in question, and AGUILA, ANABO, and Coconspirator A further knew and intended that these false statements were and would be material, i.e., that the false statements would tend to cause the banks to part with money. Moreover, AGUILA, ANABO, and Coconspirator A recruited or knew of the recruitment or reasonably should have known of the recruitment of these straw buyers by seeking individuals with high enough credit scores to cause the banks to offer loans at a more competitive rate or otherwise on more favorable terms than the banks otherwise would have offered; meanwhile, these straw buyers were compensated for their participation, sometimes without knowing that they would be ultimately responsible for mortgage payments on their newly-acquired homes, and thus subject to disastrous credit consequences when Capital Access stopped making those payments. AGUILA, ANABO, and Coconspirator A did all of this knowingly and with the intent to defraud.

Three transactions exemplify the means and method of the scheme. First, in December 2005 and January 2006, AGUILA, ANABO, and Coconspirator A arranged for Homeowner 1, a distressed homeowner, to sell his house at 210 Hampshire Street in Vallejo, California, for $530,000 to a "qualified investor" named Straw Buyer 1. As a part of that transaction, AGUILA, ANABO, and Coconspirator A knew of and arranged for Straw Buyer 1 to state on her loan application and banking documents that she would occupy the house as her primary residence, and that the source of the down payment was Straw Buyer 1. AGUILA, ANABO, and Coconspirator A knew that these statements were false and material, and in fact arranged for down payment funds ($59,463.60) to be sent from a Capital Access Travis Credit Union account (ending 8602-00) to Financial Title, in escrow, on or about December 27, 2005. Downey Savings & Loan, then a federally insured financial institution, approved the loan of approximately $477,000 (loan number 9042088989), based on these false statements. On or about January 11, 2006, the proceeds from the sale, approximately $139,454.90, were not sent to the homeowner, but rather went from escrow to Sayraw Holdings, a company operated by Coconspirator A, by way of a Washington Mutual bank account ending 2333. Coconspirator A then deposited that $139,454.90, as part of an approximately $219,070.80 deposit on or about January 13, 2006, into the same Capital Access Travis Credit Union account (ending 8602-00) that made the down payment, and which AGUILA, ANABO, and Coconspirator A controlled as signatories. Meanwhile, on or about January 11, 2006, approximately $23,147.40 was paid from escrow to Quest Financial, a company operated by ANABO. Capital Access used funds from Travis Credit Union account ending 8602-00 for, inter alia, down payments to purchase more properties, mortgage payments on behalf of straw buyers, maintenance and insurance premiums on those properties, payroll expenses, payments to others, and personal expenses for AGUILA, ANABO, and Coconspirator A.

Second, in January 2006, AGUILA, ANABO, and Coconspirator A arranged for Homeowner 2, a distressed homeowner, to sell her house at 145 Pavon in Hercules, California for $674,000 to a "qualified investor" named Straw Buyer 2. As a part of that transaction, AGUILA, ANABO, and Coconspirator A knew of and arranged for Straw Buyer 2 to state on his loan application and banking documents that he would occupy the house as his primary residence and that the source of the down payment was Straw Buyer 2. AGUILA, ANABO, and Coconspirator A knew that these statements were

false and material, and in fact arranged for the down payment funds (approximately $73,786.16) to be sent from a Capital Access Travis Credit Union account (ending 8602-00) to Financial Title, in escrow, on or about January 5, 2006. Downey Savings & Loan, then a federally insured financial institution, approved the loan of approximately $606,600 (loan number 9042089060), based on these false statements. The proceeds from the sale, approximately $79,615.90, were sent on or about January 11, 2006, not to the homeowner, but rather from escrow to Sayraw Holdings, a company operated by Coconspirator A, by way of a Washington Mutual bank account ending 2333. On or about January 13, 2006, Coconspirator A then deposited that approximately $79,615.90, as part of an approximately $219,070.80 deposit, into the same Capital Access Travis Credit Union account (ending 8602-00) that made the down payment, and which AGUILA, ANABO, and Coconspirator A controlled as signatories. Meanwhile, on or about January 11, 2006, approximately $29,391.34 was paid from escrow to Quest Financial, a company operated by ANABO. Capital Access used funds from Travis Credit Union account ending 8602-00 for, inter alia, down payments to purchase more properties, mortgage payments on behalf of straw buyers, maintenance and insurance premiums on those properties, payroll expenses, payments to others, and personal expenses for AGUILA, ANABO, and Coconspirator A.

Third, in April 2006, AGUILA, ANABO, and Coconspirator A arranged for Homeowner 3, a distressed homeowner, to sell her house at 727 Highland Place in San Dimas, California for $594,000 to "qualified investors" Straw Buyers 3a and 3b. As a part of that transaction, AGUILA, ANABO, and Coconspirator A knew of and arranged for Straw Buyers 3a and 3b to state on their loan application and banking documents that they would occupy the house as their primary residence, and that the source of the down payment was Straw Buyers 3a and 3b. AGUILA, ANABO, and Coconspirator A knew that these statements were false and material, and in fact arranged for the down payment funds (approximately $121,792.58) to be sent from the Sayraw Holdings Washington Mutual account ending 2333 to Financial Title, in escrow. Downey Savings & Loan, then a federally insured financial institution, approved the loan of approximately $475,200 (loan number 9042249177), based on these false statements. The proceeds from the sale, approximately $250,710.28, were sent on or about April 25, 2006, not to the homeowner, but rather from escrow to Sayraw Holdings, a company operated by Coconspirator A, by way of the same Washington Mutual account ending 2333. On or about April 27,

2006, Coconspirator A then deposited that exact amount (approximately $250,710.28) into the same Capital Access Travis Credit Union account (ending 8602-00) that made the down payments on the other two example properties, and which AGUILA, ANABO, and Coconspirator A controlled as signatories. Meanwhile, on or about April 25, 2006, approximately $15,116.00 was paid from escrow to Quest Financial, a company operated by ANABO, by way Quest's Travis Credit Union account ending 7508-01. Capital Access used funds from Travis Credit Union account ending 8602-00 for, inter alia, down payments to purchase more properties, mortgage payments on behalf of straw buyers, maintenance and insurance premiums on those properties, payroll expenses, payments to others, and personal expenses for AGUILA, ANABO, and Coconspirator A.

Of the dozens to hundreds of victim homeowners affected by the scheme, at least five individual distressed homeowners known to the government suffered substantial financial hardship, e.g. lost their homes and were forced to move and lost the entirety of their sole major investment (home equity), as a result of the conduct of AGUILA, ANABO, and Coconspirator A. First, Homeowner 3 lost her home at 727 Highland Place in San Dimas, California, and was forced to vacate the home in July 2008. She also lost, at a minimum, approximately $125,000 in equity that she had in the property from her down payment alone, in addition to monthly payments that she made to Capital Access at the rate of approximately $2,900 for twelve months. Second, Victim 1 lost his home of 20 years at 816 Ruddy Lane in Suisun City, California, and was forced to vacate the home in June 2008. He also lost all of the equity in his home, which he had planned to use for his retirement funding, in addition to monthly payments of approximately $2,100 to Capital Access that he had made in conjunction with his wife for some months. Third, Victim 2 lost his home at 1010 Ohio Street in Fairfield, California, causing him to move into a friend's house in approximately 2007. He also lost all of the equity in his home, as well as monthly payments of approximately $2,200 to Capital Access that he made for some months. Fourth, Victim 3 lost her home at 1052 Andy Circle in Sacramento, California, which was originally her father-in-law's, and was forced to vacate on or about February 28, 2009. She also lost all of the equity in her home, as well as monthly payments of approximately $1,749.85 to Capital Access that she made for some months. Fifth, Victim 4 lost his home at 900 Cookson Street in Vacaville, California, and was forced to vacate the home. He also lost all of the equity in his home, as well as monthly payments of

approximately $1,600 to Capital Access that he made for some months. Finally, he lost various high-value home appliances as a part of the foreclosure process. These victims made substantial changes to their living arrangements and suffered substantial losses of their savings and investment fund (the equity in their homes) as a consequence of the scheme perpetrated by AGUILA, ANABO, and Coconspirator A.

In all, AGUILA, ANABO, and Coconspirator A caused the fraudulent sale of at least approximately $27,025,635 in home properties; caused federally-insured financial institutions to issue at least approximately $23,993,106 in fraudulently-obtained property loans; and caused an estimated actual loss to the lenders of at least approximately $10,473,606.

Finally, on September 3, 2015, ANABO was interviewed by the FBI in Fairfield, California. ANABO admitted to working with Capital Access in loan applications. He acknowledged that the source of the down payments was Capital Access, not the straw buyers applying for the loans; that he referred to straw buyers as "qualified investors"; that he earned real estate commissions for his work on Capital Access transactions; that the straw buyers were paid a fee for use of their name and credit; and that Capital Access, not the straw buyers, made the resulting mortgage payments. Although not recalling whether he used funds from Capital Access for personal use, ANABO admitted that he went on a vacation to Hawaii paid for by Capital Access funds.

I, Omar Anabo, have carefully reviewed the above Exhibit A: Factual Basis for Plea with my attorney and it has been interpreted for me into my own language. As far as my own conduct is concerned, the facts described above are true and I adopt this Factual Basis for Plea as my own true statement.

Dated: 1/15/2016

OMAR ANABO
Defendant

Dated:

Interpreter